**In re AIR CRASH DISASTER AT GANDER, NEWFOUNDLAND ON DECEMBER 12, 1985.**

**MDL No. 683.**

United States District Court, W.D. Kentucky, Paducah Division.

April 20, 1987.

Stanley M. Chesley, Waite, Schneider, Bayless & Chesley, Cincinnati, Ohio, Lee S. Kriendler, Kreindler & Kreindler, New York City, Paul D. Welker, Clarksville, Tenn., Geneva F. Parris, Futrell, Hopson & Parris, Cadiz, Ky., for plaintiffs.

John J. Martin, Bigham, Englar, Jones & Houston, New York City, for defendants.

Edward H. Stopher, Boehl, Stopher, Graves & Deindoerfer, Louisville, Ky., John J. Martin, Bigham, Englar, Jones & Houston, New York City, and Albert R. Vermeire, Monbleau, Vermeire & Turley, P.C., Phoenix, Ariz., for Arrow Air and Batch Air, Inc.

Barry L. Davis, Thornton, David & Murray, P.A., and Harry Weisberg, Miami, Fla., for Arrow Air, Batch Air, Intern. Air Leases and Jane Griffin.

Michael R. Gallagher, Gallagher, Sharp, Fulton & Norman, Cleveland, Ohio, for Arrow Air, Intern. Air Leases, Inc. and John Doe No. 1, 2 and 3.

Leonard E. Nagi, Zamplas, Paskin, Nagi, Baster, Johnson & Walker, P.C., Detroit, Mich., Scott W. Pink and Michael R. Marron, Marron, Reid & Sheehy, San Francisco, Cal., for Arrow Air, Batch Air and Intern. Air Leases, Inc.

R.K. Christovich, New Orleans, La., Robert F. Ruckman, H. Dudley Chambers, David T. Moran and Bryan C. Collins, Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., Larry S. Kaplan and James F. Murphy, Conklin & Adler, Ltd., Chicago, Ill., J. Grant McCabe, III, Philadelphia, Pa., Michael Penick, Boehl, Stopher, Graves & Deindoerfer, Paducah, Ky., Robert W. Wilson, Evans & Dixon, Edwardsville, Ill., Samuel H. Franklin and Norman Jetmundsen, Jr., Bradley, Arant, Rose & White, Birmingham, Ala., William A. Pietragallo, Meyer, Darragh, Buckler, Bebenek & Eck, Pittsburgh, Pa., Richard F. Allen and David T. Hunter, Lane, Powell, Moss & Miller, Seattle, Wash., Russell B. Holloway and A. Scott Johnson, Holloway, Dobson, Hudson & Bachman, Oklahoma City, Okl., for Arrow Air, Inc.

Richard C. Roberts and E.F. Straub, Whitlow, Roberts, Houston & Russell, Paducah, Ky., Stephen C. Kenney, Roland R. Stevens and Thomas M. Frieder, Fisher & Hurst, San Francisco, Cal., Fred Meyers and Denny Walters, Karr, Tuttle, Koch, Campbell, Mawer & Morrow, Seattle, Wash., Robert Beshears, O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, Phoenix, Ariz., John R. Muth, Miller, Johnson, Snell & Cummiskey, Grand Rapids, Mich., and Tom Frieder, Fisher & Hurst, San Francisco, Cal., for World Airways, Inc.

William T. Warner, Confliff, Sandmann, Gorman & Sullivan, Louisville, Ky., Michael B. McKinnis and Terrence J. O'Toole, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., Steven M. Edwards, Davis, Markel, Dwyer & Edwards, New York City, Norman J. Barry and Daniel Cummings, Rothschild, Barry & Myers, Chicago, Ill., and Robert J. Dwyer, Bryan, Cave, McPheeters & McRoberts, New York City, for McDonnell Douglas Corp.

Diego A. Ramos, San Juan, P.R., for Associated Aviation Underwriters.

Curtis, Mallet-Prevost, Colt & Mosle, New York City, Edgar A. Zingman and Robert C. Ewald, Wyatt, Tarrant & Combs, Louisville, Ky., for Pratt Whitney Group.

## MEMORANDUM OPINION

JOHNSTONE, Chief Judge.

This matter is before the court upon Arrow Air Corporation's, Batch Air Corporation's, and World Air Incorporated's Motions to Dismiss for lack of *in personam* jurisdiction. Plaintiffs claim both diversity jurisdiction, 28 U.S.C. § 1332, and federal question jurisdiction under 28 U.S.C. § 1331.

### FACTS

This litigation was precipitated by the crash of Flight 950, a McDonnell-Douglas DC–8, owned by Arrow Air Corporation and chartered by the Multinational Force and Observers (the MFO). At the time of its crash, Flight 950 was transporting two hundred and forty-eight members of the 3rd Batallion 503d Infantry 101st Airborne Division from active duty in the Middle East to Fort Campbell, Kentucky. All passengers and crew aboard were killed in the crash.

After the crash, over fifty Complaints seeking damages for wrongful death were filed in the United States District Court for the Western District of Kentucky against Arrow Air Corporation (Arrow), Batch Air Corporation (Batch), and World Airways Incorporated (World). The Complaints allege that Arrow operated the accident aircraft, and that Batch and World serviced and maintained it. Pursuant to the Judicial Panel on Multidistrict Litigation's Order of April 10, 1986, 633 F.Supp. 50, all of these actions were consolidated in MDL #683 with actions transferred from other jurisdictions.

### I. LONG ARM JURISDICTION OVER ARROW

Plaintiffs brought this action[1] pursuant to 28 U.S.C. § 1332. Accordingly, this court must look to the law of Kentucky, particularly the Kentucky long arm statute, KY.REV.STAT. § 454.210 (hereinafter referred to as K.R.S.),[2] to determine whether there is personal jurisdiction over the defendants. *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The defendants contest the assertion of jurisdiction over them pursuant to the Kentucky long arm statute on three basic grounds: 1) the defendants neither acted nor caused injury "in" Kentucky, 2) the plaintiffs' claims do not "arise from" the defendants' acts in Kentucky, and 3) the defendants do not have sufficient "minimum contacts" with Kentucky such that it would be fair and reasonable under due process to exercise jurisdiction over them.

#### A. Statutory Analysis

Defendant Arrow contends that one must begin the analysis of an assertion of *in personam* jurisdiction with a review of the relevant long arm statute. *Davis H. Elliot Co. v. Caribbean Utilities Co.,* 513 F.2d 1176 (6th Cir.1975). According to Arrow's review of the Kentucky long arm statute, none of its activities fall within any of the actions enumerated in K.R.S. § 454.-210(2)(a) which give rise to jurisdiction in Kentucky. Defendant Arrow argues that that if its actions cannot be pigeonholed into one of the subsections of 454.210(2)(a), that this court has no jurisdiction over it regardless of whether constitutional due process would permit the exercise of jurisdiction.

The court declines to follow Arrow's method of analyzing the Kentucky long arm statute. The determination of the reach of the Kentucky long arm statute and the reach of due process are one in the

---

1. References in this Memorandum Opinion to "this action" or "this case" refer collectively to the MDL #683 cases which were originally filed in Kentucky.

2. The Kentucky long arm statute, KY.REV.STAT. § 454.210(2)(a) [hereinafter referred to as K.R.S.], reads in pertinent part:

 (2)(a) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a claim arising from the person's:

 1. Transacting any business in this Commonwealth;

 2. Contracting to supply services or goods in this Commonwealth;

 . . . . .

 (b) When jurisdiction over a person is based solely upon this section, only a claim arising from acts enumerated in this section may be asserted against him.

same. *Handley v. Indiana & Michigan Electric Co.*, 732 F.2d 1265, 1268–1270 (6th Cir.1984); *First National Bank of Louisville v. J.W. Brewer Tire Co.*, 680 F.2d 1123, 1125 (6th Cir.1982); *Poyner v. Erma Werke GMBH*, 618 F.2d 1186, 1188 (6th Cir.1980); *Mohler v. Dorado Wings, Inc.*, 675 S.W.2d 404 (Ky.Ct.App.1984). Accordingly, the Kentucky statute is measured in whole *and in part* by the extent of due process.

### B. Acts "in this Commonwealth"

■ The defendants argue that the assertion of long arm jurisdiction over them is improper because the defendants did not act "in" Kentucky. Defendants' argument is grounded upon the premise that their actions on Fort Campbell were not "in" Kentucky for the purposes of Kentucky jurisdiction.

Fort Campbell is a military enclave situated partly within the confines of the state of Kentucky and partly within the confines of the state of Tennessee.[3] The Kentucky portion of Fort Campbell was created in the early 1940's by condemnation or purchase, and not by special cession of the Kentucky legislature.[4] Arrow claims that under the Kentucky law in existence at the time of Fort Campbell's creation,[5] and Article I, section 8, clause 17, of the United States constitution,[6] Kentucky ceded exclusive jurisdiction over the area comprising Fort Campbell to the United States. As a result of this cession, Arrow claims that the Kentucky courts do not have any jurisdiction over the persons or activities carried out at Fort Campbell, and that the laws of the Commonwealth of Kentucky are without effect in that enclave except to the extent those laws have been adopted as the federal law of the enclave or as otherwise authorized by Congress. Accordingly, the defendants conclude that any transactions between them and persons on Fort Campbell were not "in" Kentucky within the meaning of K.R.S. § 454.210(2)(a).

Article I, section 8, clause 17 of the Constitution grants Congress the power of "exclusive Legislation" over federal enclaves. U.S. CONST., art. I, § 8, cl. 17. Defendants contend that the assumption of jurisdiction over Fort Campbell under this section of the Constitution precludes an action in a Kentucky court as to matters occurring on the grounds of Fort Campbell. The court cannot agree. "Nothing inherent in exclusive federal sovereignty over a territory precludes a state court from entertaining a personal injury suit concerning events occurring in the territory and governed by the federal government." *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 101 S.Ct. 2870, 2877, 69 L.Ed.2d 784 (1981); *Ohio River Contract Co. v. Gordon*, 244 U.S. 68, 37 S.Ct. 599, 601, 61 L.Ed. 997 (1917). Moreover, state courts routinely exercise subject matter jurisdiction over civil cases arising from events in other states. The fact "that the location of the event giving rise to suit is an area of exclusive federal jurisdiction rather than

---

**3.** The military airfield at Fort Campbell is wholly within the boundaries of the state of Kentucky.

**4.** In contrast, Fort Knox, another military reservation in Kentucky, was ceded to the United States by special statute, presently codified at K.R.S. § 3.030.

**5.** Jurisdiction over Fort Campbell was ceded to the United States by Kentucky Statutes 2376, now codified as K.R.S. § 3.010. Section 3.010 as it existed in 1948 read:

The Commonwealth of Kentucky consents to the acquisition by the United States of all lands and appurtenances in this state, heretofore legally acquired, or that may be hereafter legally acquired by purchase, or by condemnation, for the erection of forts, magazines, arsenals, dock yards, post offices, custom houses, courthouses and other needful buildings, and for locks, dams and canals in improving the navigation of the rivers and waters within and on the borders of Kentucky.

**6.** U.S. CONST. art. I, § 8, cl. 17 grants Congress the power,

[t]o exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, Dock-Yards, and other needful buildings.

another State, does not introduce any new limitation on the forum State's subject matter jurisdiction." *Gulf Offshore* 101 S.Ct. at 2877.

This is not to say that the states may exercise long arm jurisdiction over parties acting within a federal enclave in every case. If the United States has assumed exclusive jurisdiction over territory, and there is a conflict between the federal government's exercise of territorial sovereignty and the exercise of jurisdiction by the state, the state must give way. U.S. CONST., art. VI, cl. 2. Absent an actual conflict however,

> [t]he fiction of a state within a state can have no validity to prevent the state from exercising its power over the federal area within its boundaries.... The sovereign rights in this dual relationship are not antagonistic. Accommodation and cooperation are their aim. It is friction, not fiction, to which we must give heed.

*Howard v. Commissioners of Sinking Fund of City of Louisville*, 344 U.S. 624, 73 S.Ct. 465, 467, 97 L.Ed. 617 (1953). *See also United States v. McGee*, 714 F.2d 607 (6th Cir.1983).

While this court is concerned with actual friction between the state of Kentucky and the United States, *Howard, supra,* it does not find the clash of sovereigns hypothesized by the defendants in this case. Moreover, it would be anomalous to hold that a foreign corporation doing business in Kentucky with the federal government may not be sued in federal court with respect to such business *because* it was done on federal territory. *Knott v. Furman*, 163 F.2d 199, 206 (4th Cir.1947).

In cases similar to the present one, federal courts have found a foreign corporation working on a federal military reservation to be transacting business in the state surrounding the reservation for the purpose of service of process under state law. *See, e.g., Swanson Painting Co. v. Painters Local Union No. 260*, 391 F.2d 523 (9th Cir.1968); *Knott Corp. v. Furman*, 163 F.2d 199, 206–7 (4th Cir.1947), *cert. denied,* 332 U.S. 809, 68 S.Ct. 111, 92 L.Ed. 387 (1947); *Stockwell v. Page Aircraft Maintenance, Inc.*, 212 F.Supp. 102 (D.C.Ala. 1962); *Ackerley v. Commercial Credit Co.*, 111 F.Supp. 92 (D.C.N.J.1953). *See generally* 4 C. Wright & A. Miller, *Federal Practice and Procedure* § 1069. In all of these cases, the state whose long arm statute was being invoked reserved the right to serve process within the bounds of the federal enclave when it ceded the land to the United States. In reserving the power to serve process, the state also reserved long arm jurisdiction over matters occurring on the ceded land. As the Fourth Circuit Court of Appeals explained in *Knott v. Furman:* if,

> the state has retained the right to serve process on foreign corporations as well as on others within the reservation and has the power to say what shall constitute such service, it follows that any act which may be legally taken as an acceptance of service elsewhere within the state may be so taken within the reservation. This necessarily means that the doing of business by a foreign corporation within the reservation has the same effect, so far as submitting itself to the local jurisdiction for the service of process is concerned, as doing business elsewhere within the state.

*Knott* at 206.

 In its general ceding statute, Kentucky did not reserve the right to serve process on any lands ceded or purchased by the United States for military bases.[7] Until very recently, Kentucky had very little

---

7. K.R.S. § 3.020, a version of which has been on the Kentucky statute books since 1882, reserves the right to serve process on some lands ceded to the federal government, but not on military bases. K.R.S. § 3.020 provides:

> Kentucky retains jurisdiction for the execution of process, issued under its authority, over all lands in Kentucky heretofore or hereafter ceded to or acquired by the United States for the erection or establishment of post offices, customs houses, courthouses, locks, dams, canals, parks, cemeteries or forest reserves.

This statute is a compilation of various exceptions and reservations made by the state of Kentucky in granting or ceding lands to the United States for locks, parks, and forest preserves.

jurisdiction over matters occurring on Fort Campbell. *See, e.g., Lathey v. Lathey*, 305 S.W.2d 920 (Ky.1957); *Kingwood Oil Co. v. Henderson County Board of Supervisors*, 367 S.W.2d 129 (Ky.1963). However, in 1976, the United States receded the power to serve process on Fort Campbell to the Commonwealth.[8] After the recession, actions within Fort Campbell have had the same effect, so far as submitting to the long arm jurisdiction of Kentucky is concerned, as actions elsewhere within Kentucky. *Knott* at 206.

For the purposes of determining the propriety of long arm jurisdiction in this case, the defendants' actions on Fort Campbell were "in" Kentucky.

### C. Claims "Arising From" the Defendants' Acts

The defendants maintain that the cause of action in the present case does not arise from any transaction within the Commonwealth of Kentucky set forth in K.R.S. § 454.210(2)(a), as required by K.R.S. § 454.210(2)(b). Defendants interpret K.R.S. § 454.210(2)(b) to require the acts which constitute contacts establishing a basis for long arm jurisdiction to be the same acts causing injury. The defendants assert that the claims in this case arose from their actions outside of Kentucky, and conclude that the assertion of jurisdiction over them is improper as a matter of statutory construction and constitutional principal. *Southern Machine Co. v. Mohasco Industries, Inc.*, 401 F.2d 374 (6th Cir.1968).[9]

The court rejects the defendants' construction of K.R.S. § 454.210(2). Section 454.210(2) substantially parallels § 1.03 of the Uniform Interstate and International Procedure Act. The Comments to the Uniform Act indicate that it was intended to provide a jurisdictional basis for any claim related to the defendant's contacts with the forum. *See* UNIF. INTERSTATE AND INTERNATIONAL PROC. ACT. § 1.03 commentary to § 1.03(a) and (b) at 362, 364.[10] In construing statutes based upon the Uniform Act, courts have urged a broad reading of [11] and

---

**8.** Counsel have not favored the court with a discussion of the United State's recession of the power to serve process on Fort Campbell to Kentucky pursuant to 10 U.S.C. § 2683. By letter dated May 24, 1976 from Secretary of the Army Martin R. Hoffmann, the United States receded the power to serve civil and criminal process on Fort Campbell to the Commonwealth of Kentucky. Governor Julian Carroll accepted the recession on behalf of the Commonwealth on June 10, 1976.

**9.** In *Southern Machine*, the Court of Appeals for the Sixth Circuit set forth the following three factors as relevant in determining whether the exercise of jurisdiction is proper:

First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Southern Machine* at 381. This three part analysis has been adopted by the Kentucky courts in construing the Kentucky long arm statute. *See Tube Turns Division of Chemetron Corp. v. Patterson Co., Inc.*, 562 S.W.2d 99, 100 (Ky.App. 1978).

Defendants contend that the second prong of this three part analysis precludes the assertion of jurisdiction over them pursuant to sections 1 or 2 of K.R.S. § 454.210(2)(a). The court cannot agree with this interpretation of the Kentucky statute, particularly in light of the broad approach taken by the *Southern Machines* court as to what constitutes a cause of action "arising from" a defendant's activities in the forum state. *See id.* at 384.

**10.** The Commentary to the UNIFORM INTERSTATE AND INTERNATIONAL PROCEDURE ACT states in pertinent part that,

Each of the subdivisions [of § 1.03(a)] will support a cause of action under any theory of law. For example, a claim arising from "transacting business" may sound in contract, tort, or quasi contract.

. . . . .

The concept of cause of action or claim for relief [in § 1.03(b)] should be broadly construed to cover an entire transaction so that, when possible, the entire dispute may be settled in a single litigation. Subdivision (b) is designed to prevent assertion of independent claims unrelated to any activity described in subdivision (a) of section 1.03.

**11.** *See, e.g., Southern Machine Corp. v. Mohasco Industries Co.*, 401 F.2d 374, 384 n. 29 (6th Cir.1968) ("Only when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does not arise from that contract.") (construing Tennessee long arm statute); *Snyder v. Hampton Industries, Inc.*, 521 F.Supp.

have given broad scope to the "arising from" language in § 1.03.[12] The court construes the Kentucky statute in like manner.

■ Constitutional considerations do not require the narrow interpretation of the Kentucky statute urged by the defendants. As noted above, the Kentucky long arm statute reaches only as far as due process permits. *See Poyner, supra.* A state court may *constitutionally* exercise jurisdiction over a person as to claims which "arise out of or relate to" that person's purposeful activities in the state. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984); *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985). Indeed, it is enough for the purposes of due process that the basis of plaintiffs' suit has a "substantial connection" with the forum state. *McGee v. International Life Insurance Company,* 355 U.S. 220, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957); *Southern Machine, supra* at 384 n. 27.

■ In the present case, the claims against Arrow fall within the literal reach of the Kentucky long arm statute. Specifically, Arrow's actions in conducting its air transportation business on Fort Campbell and in other parts of Kentucky constituted "transacting any business" in Kentucky.

Therefore, 454.210(2)(a)1 serves as a basis for jurisdiction over Arrow. Additionally, Defendant Arrow's contract with the MFO was clearly intended to be performed, in part, in Kentucky. It therefore falls within the scope of K.R.S. § 454.210(2)(a)2, which extends jurisdiction over claims arising from "[c]ontracting to supply services or goods in" Kentucky. Moreover, giving the statutory language the meaning permitted by due process, it is clear that the plaintiffs' claims arise from the defendants' contacts with Kentucky. Plaintiffs' suits in the present case are based upon the relationships and obligations formed as a consequence of Arrow's conduct of its air transportation business in Kentucky. These claims have *more* than a substantial connection with Arrow's in-state activities for the obligations and relationships underlying this litigation were formed as a consequence of Arrow's purposeful actions within and concerning Kentucky.

### D. Constitutional Due Process Analysis

■ As an integral step in gauging the propriety of an assertion of Kentucky's long arm jurisdiction, the court must decide whether the defendants purposefully established "minimum contacts" with Kentucky such that the maintenance of a suit in

---

130, 139–41 (D.Md.1981), *aff'd,* 758 F.2d 649 (4th Cir.1985) ("cause of action" and "arising from" language in Maryland long arm statute encompasses "a claim having a substantial relationship with" defendant's contacts with the forum state); *Mohler v. Dorado Wings, Inc.,* 675 S.W.3d 404, 406 (Ky.Ct.App.1984) ("If a defendant is transacting business within the Commonwealth, it is not necessary that a tort be committed herein."); *Edward J. Moriarty & Co. v. General Tire & Rubber Co.,* 289 F.Supp. 381, 391 (S.D.Ohio 1967) ("arising from" requirement encompasses a cause of action sounding in tort or contract when jurisdiction asserted under "transacting any business" provision of the Ohio long arm statute).

**12.** *See, e.g., National Can Corporation v. K Beverage Co.,* 674 F.2d 1134, 1138 (6th Cir.1982) (claim on guaranty contract between Illinois company and non-residents of Kentucky, which was signed in North Dakota, "arose from" the guarantors' "transacting any business" in Kentucky); *In-Flight Devices Corporation v. Van Dusen Air, Inc.,* 466 F.2d 220 (6th Cir.1972) (claim for damage to business reputation "arose from"

breach of contract entered into with an Ohio corporation); *Moore v. Little Giant Industries Inc.,* 513 F.Supp. 1043, 1047–48 (D.Del.1981), *aff'd,* 681 F.2d 807 (3d Cir.1982) (negligence claim "arose from" a contract to supply goods in Delaware); *KDI Precision Products, Inc. v. Radial Stampings,* 620 F.Supp. 786, 791 (S.D.Oh. 1985) (implied warranty claim "arose from" contract negotiations in the forum state); *Clay v. Hopperton Nursery, Inc.,* 533 F.Supp. 476, 481 (E.D.Ky.1982) (products liability claim "arises from" defendant's out-of-state actions under K.R.S. § 454.210(2)(b) in contracting for sale of goods to Kentucky resident); *Graham Engineering Corp. v. Kemp Products Ltd.,* 418 F.Supp. 915, 921 (N.D.Oh.1976) (patent claim by one not party to license contract which constituted "transacting any business" in the forum state "arises from" the contract); *Didactics Corp. v. Welch Scientific Co.,* 291 F.Supp. 890, 895 (N.D. Oh.1968) (patent claims "arose from" a contract to supply teaching machines in Ohio by Illinois corporation).

Kentucky would comport with traditional notions of fair play and substantial justice. *See International Shoe Co. v. State of Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *Southern Machine Co. v. Mohasco Industries Inc.*, 401 F.2d 374 (6th Cir.1968). In determining the constitutionality of long arm jurisdiction in the present case, the court must consider 1) the nature and quality of the defendants' contacts with Kentucky, 2) whether the defendants' actions constituted a purposeful availment of the benefits of Kentucky's laws, 3) whether it was foreseeable that the defendants might be subject to Kentucky law, and 4) whether certain other factors indicate that the exercise of jurisdiction in this case is proper. *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 571, 567, 62 L.Ed.2d 490 (1980); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985).

### 1. Nature and Quality of the Defendants' Contacts

#### a. Arrow

Arrow is incorporated under the laws of the State of Delaware. Its principal place of business is within the State of Florida. Arrow contends it has no economic contacts with Kentucky. Arrow claims it only flew twice into a commercial Kentucky airfield, and that all other landings were within the federal enclave of Fort Campbell. Further, Arrow alleges that it has never purchased goods or services in Kentucky, operated regularly scheduled flight services into Kentucky, had a bank account, office or telephone number in Kentucky, or made a contract for the transportation of soldiers in Kentucky, including the contract concerned in this case.

Plaintiffs paint a different picture of the contacts between Arrow and Kentucky. Plaintiffs aver, and Arrow does not deny, that in 1983 Arrow hangared an aircraft at the Greater Cincinnati International Airport in Covington, Kentucky.[13] Arrow employed mechanics at that facility to work on a Boeing 727 cargo jet which it used for its regularly scheduled cargo flights. These cargo flights came into Northern Kentucky five days per week.[14] In connection with these Northern Kentucky operations, Arrow contracted for and entered into a bond with the Kenton County Airport Board in order to maintain its Kentucky facilities. Arrow also contracted to fly out of Louisville, Kentucky in 1983.[15] Finally, between late 1984 and 1986, Arrow contracted for and flew flights into Kentucky for the Military Airlift Command and Military Traffic Management Command. Pursuant to this contract, Arrow flew into the Fort Campbell military airfield, and the commercial airport in Lexington, Kentucky. Arrow earned substantial revenue from the cargo and military charter flights which came into or through Kentucky and realized over $2 million from the MFO contract alone.

Arrow's claim of a total absence of contacts with Kentucky is unsupported. Plaintiffs' evidence shows that Arrow has acted within the state of Kentucky, and has engaged in a substantial air transportation business, from which business this action springs. Such actions constitute minimum contacts with the state of Kentucky.

#### b. World

World is incorporated under the laws of Delaware, and has its principal place of business in California. World claims that it has no business offices, no business operations, performs no aircraft maintenance, leases no property, holds no investments, engages in no advertising, has no certificate to do business, no employees or

**13.** *See* Exhibits A and C, Plaintiffs' Memorandum in Opposition to Motion to Dismiss [hereinafter Plaintiffs' Memorandum].

**14.** *See* Affidavit of William J. Green, one of the mechanics employed at the Greater Cincinnati International Airport, Exhibit A, Plaintiffs' Memorandum.

**15.** *See* Answer and Counterclaim, *Arrow Air Inc. v. United Parcel Service Co.*, 85–41297–CIV–16 (11th Judicial Circuit, Dade County, Florida 1985), Exhibit B, Plaintiffs' Memorandum.

agents, no post office box or telephone listing located in the state of Kentucky.

Plaintiffs paint a picture of contacts between World and Kentucky similar to the contacts between Arrow and Kentucky. Plaintiffs point to a continuing series of direct contacts with Kentucky. For example, World solicits business in Kentucky through the maintenance of a toll-free Kentucky access number [16] and the issuance of accommodation plates for tickets to at least one Kentucky travel agency.[17] Furthermore, World authorizes the generation of tickets in Kentucky through airline computer systems such as SABR, thereby allowing a majority of travel agents in Kentucky to write tickets on World Airways.

In addition to, or perhaps in conjunction with these services, World has flown directly into Kentucky on repeated occasions.[18] For example, World flew thirteen flights out of Covington, Kentucky and two flights out of Louisville, Kentucky in 1979, and eleven flights out of Louisville, Kentucky in 1985.[19] In addition to these commercial flights, World-operated aircraft flew into and out of Fort Campbell, Kentucky, on Military Airlift Command flights on approximately six separate occasions during 1985.

Plaintiffs also allege a series of indirect contacts between World and Kentucky. For example, a World aircraft and crew were subleased to United Parcel Service for a short time in 1985 and the subleased aircraft and crew made flights to and from Louisville, Kentucky.[20] Also, World made component repairs, and loaned or sold parts for substantial sums of money to Arrow and Batch, who in turn flew into Kentucky. From all of these activities, World Airways derived hundreds of thousands of dollars in revenue.

As with Arrow, World's claim that it has no contacts with Kentucky is not supported in the record. World has contacts with Kentucky; however, it is difficult for the court to assess whether the claims against World arise from or are substantially related to World's contacts with Kentucky. Plaintiffs seek to assert general jurisdiction over World. While the exercise of general jurisdiction over World might be constitutionally permissible, *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952), an assertion of general jurisdiction may not be permissible under a "single act" statute such as Kentucky's. *See Southern Machine Co. v. Mohasco Industries, Inc.*, 401 F.2d 374 (6th Cir.1968) (putting cases considering the assertion of general jurisdiction "aside" in consideration of Tennessee's "single act" long arm statute).[21] In light of the court's consideration of the plaintiffs' pendent jurisdiction arguments below, it is not necessary to determine whether an assertion of general jurisdiction is proper under the Kentucky long arm statute.

#### c. Batch

Batch is incorporated under the laws of the State of Florida and has its principal place of business in Florida. Batch Air claims that it simply has never conducted any business of any kind in Kentucky. It has no agent in Kentucky, no employees in Kentucky, owns no property in Kentucky, and solicits no business in Kentucky.

Plaintiffs arguments concerning Batch are more convoluted than those concerning Arrow and World. Plaintiffs basically urge the court to attribute the contacts of Arrow to Batch on the theory that Batch is merely an integral part, agent or instrumentality of Arrow. Batch and Arrow are

**16.** *See* Affidavit of Kay Robinson, Plaintiffs' Response to Motion to Dismiss Defendant World Airways Inc. [hereinafter Plaintiffs' Response].

**17.** *See* Affidavit of Beverly Robson, Plaintiffs' Response.

**18.** *See* Form 10–K, Plaintiffs' Response. *See also* World's response to Interrogatory # 6.

**19.** *See* World's response to Interrogatory # 28.

**20.** *See* World's response to Interrogatory # 6.

**21.** *See* discussion of "claims arising from" an act in Kentucky *supra,* section I.C.

owned by the same person, George Batchelor, and share the same Executive Vice President, Mr. Harry Weisberg.[22] Both companies are insured under the same policy from Lloyds of London as part of "Batchelor Enterprises."[23] Batch and Arrow work closely together in servicing Arrow's aircraft, with Batch retaining control over all of Arrow's tools and special equipment used for such servicing. This work arrangement was followed by the two companies although no agreement to do so was ever in written form.[24] Plaintiffs urge that all of these factors highlight the fact that Batch and Arrow are alter-egos. In this regard, Plaintiffs claim that at least one governmental agency has reached that conclusion.[25] Plaintiffs urge the court to "pierce the corporate veil" and hold Batch liable for the sins of Arrow. *Thermothrift Industries, Inc. v. Mono-therm Insulation Systems, Inc.*, 450 F.Supp. 398 (W.D.Ky. 1978); *Dare To Be Great, Inc. v. Commonwealth ex. rel. Hancock*, 511 S.W.2d 224 (Ky.1974); *White v. Winchester Land Development Corp.*, 584 S.W.2d 56 (Ky.Ct. App.1979). In light of the court's consideration of the plaintiffs' pendent jurisdiction arguments below, it is not necessary to take the extraordinary action urged by the plaintiffs as to Batch.

### 2. Purposeful Availment of the Benefits of Kentucky's Laws

Although this court has found contacts to exist between Arrow and Kentucky, the question remains whether such contacts are a sufficient basis upon which to exercise jurisdiction. Due process requires that a defendant have purposefully availed himself of the privilege of acting within the state in order to ensure that the state's exercise of jurisdiction over that individual is fair and reasonable. *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). The purposeful availment requirement ensures that a defendant will not be dragged into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts, *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984), *World-Wide Volkswagen, supra,* nor because of the "unilateral activity of another party or a third person." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

The defendants claim that Arrow has not availed itself of the rights and privileges of acting within Kentucky, since it acted only within a federal enclave. In support of this, the defendants claim that no revenue was derived from residents or citizens of Kentucky, and that Arrow could not sue or be sued in Kentucky court for breach of the Multinational Peace Keeping Force contract. Defendants conclude that bringing Arrow into court in Kentucky would unfairly subject Arrow to jurisdiction in a state in which it could not otherwise have been sued over these matters.

The facts do not support the defendants' position. Plaintiffs show that Arrow has voluntarily and purposely conducted a substantial air transportation business in Kentucky. Specifically, Arrow contracted to transport passengers to and from Kentucky, flew into Kentucky on numerous occasions, maintained aircraft and employees in Kentucky, and maintained a bond required under Kentucky law. All of these actions, done in the course of Arrow's air transportation business in this state, constituted a purposeful availment of the privilege of acting in Kentucky.

### 3. Foreseeability of Being Subject to Kentucky Law.

Defendants claim that the plaintiff's seek to gain jurisdiction over the defendants principally on the basis of the foreseeability of their being subject to jurisdiction in Kentucky. Defendants claim that foreseeability of acting within the jurisdiction of a state is not enough alone to grant

---

**22.** *See* National Air Transportation Board Inspection Report [hereinafter NATB Report], Exhibit F to Plaintiffs' Memorandum; Affidavit of Harry Weisberg.

**23.** *See* Exhibit G, Plaintiffs' Memorandum.

**24.** *See* NATB Report, Exhibit F, Plaintiffs' Memorandum.

**25.** *See id.* The court can find no such conclusion explicitly set forth in the portion of the Report submitted by the Plaintiffs.

jurisdiction in that state. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 566–67, 62 L.Ed.2d 490 (1980). While the defendants' assertion is accurate, actual knowledge that one is acting in or will cause a consequence within a jurisdiction is an important factor in assessing the fairness of exercising *in personam* jurisdiction over that person. *See Clay v. Hopperton Nursery, Inc.*, 533 F.Supp. 476 (E.D.Ky.1982) (asserting jurisdiction over foreign insecticide manufacturer who advertised a product in Kentucky and had actual knowledge that the product was to be used in Kentucky); *Miller v. Trans-World Airlines, Inc.*, 302 F.Supp. 174 (E.D. Ky.1969) (asserting jurisdiction over corporate out-of-state manufacturer of aircraft instruments who must have known that buyers of its products would sell airplanes to airlines which would fly into Kentucky and therefore, must have known that the plaintiff's decedent would "use, consume, or be effected by" goods and services within the meaning of the long arm statute.); *Volvo of America Corp. v. Wells*, 551 S.W.2d 826 (Ky.Ct.App.1977) (asserting jurisdiction over defendant dealer who had actual knowledge that a car would be used in Kentucky). Such knowledge reflects a deliberate decision to derive benefit by acting within the state. *See Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 300 (3d Cir.1985).

It can hardly be maintained that Arrow did not anticipate acting within the jurisdiction of Kentucky when the Arrow–MFO contract plainly listed Kentucky as a place of destination.[26] Moreover, in light of Arrow's repeated flights into and maintenance of facilities in Kentucky, it was entirely foreseeable that Arrow would be subject to the jurisdiction of Kentucky.

#### 4. Additional Factors

The court finds other factors relevant once it has been established that the de-

fendants purposefully established minimum contacts within Kentucky. Particularly, the court has considered the interest Kentucky has in adjudicating the dispute, the plaintiffs' interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, the several states' shared interest in furthering fundamental substantive social policies, and the burden placed upon the defendants in litigating this case in Kentucky. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985). Consideration of these factors has persuaded the court that the exercise of jurisdiction in this case is reasonable although there may be a lesser showing of minimum contacts here than might otherwise be required.

The defendants point out that many of the decedents were not Kentucky citizens. Indeed, in several suits, Kentucky is not even the domicile of the administrator. Defendants argue that Kentucky has little or no interest in these non-residents' actions. Apparently, the defendants seek to make the point that being the decedent's or the administrator's domicile is not itself enough to create jurisdiction over a nonresident defendant. *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).

Contrary to the defendants assertions, Kentucky does have an interest in actions of military personnel based within Kentucky. Such interest is manifest particularly by the recent changes in Kentucky's divorce statute K.R.S. § 403.140(a) (1986) facilitating divorce proceedings for military personnel. Furthermore, Kentucky courts in other situations have recognized benefits accruing to personnel based

---

**26.** Merely contracting to supply goods or services in Kentucky might not be a constitutionally sufficient basis for the exercise of in personam jurisdiction. However, when coupled with other substantial, continuous and related contacts with Kentucky, the exercise of in personam jurisdiction over Arrow on the basis the MFO contract is fair and reasonable. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S.Ct.

2174, 2182, 85 L.Ed.2d 528 (1985) (determining reach of Florida long arm statute); *Transportes Aereos de Angola v. Ronair, Inc.*, 544 F.Supp. 858, 864–66 (D.Del.1982) (determining reach of Delaware long arm statute); *Smith Lighting Sales Inc v. Blahut*, 462 F.Supp. 434 (W.D.Ok. 1978) (determining reach of Oklahoma long arm statute).

on a federal enclave. *See, e.g., Ratliff v. Lexington-Fayette Urban County Government*, 540 S.W.2d 8, 9 (Ky.1976).[27] This court finds that there is a real and substantial economic and social impact on the area of Kentucky surrounding Fort Campbell through the families and soldiers stationed at that facility, many of whom are or become Kentucky domiciliaries and citizens.[28]

As to the other factors considered, the plaintiffs in the present case are legitimately concerned with obtaining convenient and effective relief from limited resources. Furthermore, the decision of the Judicial Panel on Multidistrict Litigation to transfer cases arising from the crash at Gander to this court manifests a clear indication of the interstate judicial system's assessment as to the jurisdiction best able to render the most efficient resolution of this controversy.[29] Finally, there is a fundamental substantive policy in the law of every state to afford adequate relief to its residents for an injury caused by an out-of-state corporation. *See Burger King*, 105 S.Ct. at 2183; *McGee*, 78 S.Ct. at 201. This policy would be vitiated by refusing to exercise jurisdiction over these defendants in this case, forcing all of the plaintiffs herein concerned to refile identical actions in the courts of a distant and foreign state.

Against these factors, the court finds no substantial burden placed upon the defendants to defend suit in a state in which they have had continuous and systematic contact over the last seven years. Moreover, the defendants make no claim that the maintenance of their defense is especially burdensome to them.

On balance, the additional factors set forth above weigh in favor of the exercise of long arm jurisdiction over the defendants in this case.

### 5. Summary

In summary, the court finds that Arrow has substantial "minimum contacts" with Kentucky, and that these contacts were purposeful, continuous, and systematic. In conducting its air transportation business in Kentucky, Arrow clearly availed itself of the benefits of Kentucky's laws in a manner that made it foreseeable that Arrow would be subject to the jurisdiction of a Kentucky court. The court further finds that the claims against Arrow in this case arose out of Arrow's contacts with Kentucky, and that no additional factors weigh against the exercise of jurisdiction over Arrow. Accordingly, the exercise of jurisdiction over Arrow in this case is reasonable, and does not "offend 'traditional notions of fairplay and substantial justice.'" *International Shoe v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).

## II. FEDERAL QUESTION JURISDICTION OVER ARROW

In addition to their long arm arguments considered above, the plaintiffs also invoke

27. In *Ratliff* the court considered the benefits conferred upon personnel at the federal enclave in Avon, Fayette County, Kentucky which would justify the imposition of a tax,

We believe there are benefits, substantial and realistic, conferred by the [local] government on the employees at Avon. The installation is surrounded by the taxing district. The employees in going to and from work receive police protection and use roadways built or maintained by the urban county government. The urban county government furnishes the employees, along with other persons, with public facilities. Beautiful landscapes and other esthetic benefits are provided. It might well be inferred that Congress, by passage of the Buck Act, acknowledged that inherent in the privilege of working within a federal enclave, surrounded by an area under the control of a local government, was a benefit sufficient to support a local income tax.

28. On the other side of the coin, there is a real and continuing interest of the soldiers stationed at Fort Campbell in Kentucky. These soldiers are affected daily by Kentucky laws governing crimes, 18 U.S.C. § 13, taxes, 4 U.S.C. §§ 104–110, and unemployment and workmen's compensation, 26 U.S.C. § 3305(d); 40 U.S.C. § 290. These soldiers may resort to the Kentucky courts for divorce, K.R.S. § 403.140, may vote in Kentucky, and send their children to Kentucky's public schools.

29. The Judicial Panel on Multidistrict Litigation Transfer Order, filed April 10, 1986 reads in pertinent part:

[C]entralization under Section 1407 in the Western District of Kentucky will best serve the convenience of parties and witnesses and promote the just and efficient conduct of this litigation.

the federal question jurisdiction of this court under 28 U.S.C. § 1331,[30] claiming their case arises under both 16 U.S.C. § 457[31] and the Warsaw Convention.[32]

### A. Federal Wrongful Death Statute: 16 U.S.C. § 457

■ Plaintiffs broadly contend that 16 U.S.C. § 457 creates an independent federal cause of action for wrongful death by incorporating the wrongful death law of the several states. Plaintiffs cite several cases in support of this proposition: *Vasina v. Grumman Corp.*, 644 F.2d 112 (2d Cir.1981); *Stokes v. Adair*, 265 F.2d 662 (4th Cir.1959); *Quadrini v. Sikorsky Aircraft Division, United Aircraft Corp.*, 425 F.Supp. 81 (D.Conn.1977), *disapproved on other grounds in Vasina v. Grumman Corp.*, 644 F.2d 112 (2d Cir.1981).

Plaintiffs' reading of 16 U.S.C. § 457 is at odds with the plain meaning of the statute. Section 457 of Title 16 authorizes a personal injury action "governed by the laws of the State within the exterior boundaries of which [the federal enclave] may be," *only* "[i]n the case of a death of any person by the neglect or wrongful act of

another *within* a national park or other place subject to the exclusive jurisdiction of the United States." 16 U.S.C. § 457 (emphasis added). *Stokes, Quadrini,* and *Vasina, supra,* all concern death or injury which actually happened within the federal reserve. Such is not the case here, and both the cases and the statute cited to the court are inapplicable to this controversy. There is no substantial federal question presented on this basis.

### B. The Warsaw Convention: 49 U.S.C. App. § 1502

■ Plaintiffs contend that the Warsaw Convention creates a private federal cause of action against international air carriers for wrongful death in aircraft accidents. *See* Warsaw Convention, Article 17; *In re Mexico City Aircrash of October 31, 1979,* 708 F.2d 400 (9th Cir.1983); *Benjamins v. British European Airways,* 572 F.2d 913 (2d Cir.1978). The reasoning and ruling of those courts finding a cause of action implicit in Article 17 of the Warsaw Convention are most persuasive.[33] Accordingly, the court recognizes the right to recover

---

**30.** 28 U.S.C. § 1331.

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

**31.** 16 U.S.C. § 457:

Action for death or personal injury within rational park or other place under jurisdiction of United States; application of State laws.

In the case of a death of any person by the neglect or wrongful act of another within a national park or other place subject to the exclusive jurisdiction of the United States, within the exterior boundaries of any State, such right of action shall exist as though the place were under the jurisdiction of the State within whose exterior boundaries such place may be; and in any action brought to recover on account of injuries sustained in any such place the rights of the parties shall be governed by the laws of the State within the exterior boundaries of which it may be.

**32.** Convention for the Unification of Certain Rules Relating to International Transportation by Air, *opened for signature* Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876, 137 L.N.T.S. 11 (adherence of United States proclaimed Oct. 29, 1934). The official text of the Warsaw Convention is in French. An unofficial English translation is

reprinted at 49 U.S.C. App. § 1502 note (1976). The court will make reference to the English translation. The relevant Article giving rise to a wrongful death action is Chapter III, Article 17.

**33.** Warsaw Convention, Article 17 provides:

The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking. The Ninth Circuit in *In re Mexico City Aircrash* found a right to recover for death or injury implicit within Chapter III, Article 17. The court drew its reasoning from those cases which had held a right to recover for damage to property under Article 18 existed without any enacting statute. *See Enayati v. Lufthansa German Airlines,* 714 F.2d 75 (9th Cir.1983); *Benjamins v. British European Airways,* 572 F.2d 913 (2d Cir.1978), *cert. denied,* 439 U.S. 1114, 99 S.Ct. 1016, 59 L.Ed.2d 72 (1979).

Article 18(1) provides:

(1) The carrier shall be liable for damage sustained in the event of the destruction or loss of, or of damage to, and checked baggage or any goods, if the occurrence which caused the damage so sustained took place during the transportation by air.

for wrongful death under Article 17, and finds that the plaintiffs properly assert a *prima facie* federal question arising under the Warsaw Convention.

### 1. Warsaw Jurisdictional Requirements

 In asserting their Warsaw cause of action, the plaintiffs must meet the dual jurisdictional requirements of Article 28(1). Article 28(1) of the Warsaw Convention prescribes that

> [a]n action for damages must be brought, at the option of the plaintiff, in the territory of one of the High Contracting Parties, either before the court of the domicile of the carrier or of his principal place of business, or where he has a place of business, through which the contract has been made, or before the court at the place of destination.

Warsaw Convention, Article 28(1). This Article requires that jurisdiction be proper both as to the High Contracting Party, and as to the particular court hearing the case. *Smith v. Canadian Pacific Airways Ltd.*, 452 F.2d 798 (2d Cir.1971); *Hill v. United Airlines*, 550 F.Supp. 1048 (D. Kansas 1982).

 Jurisdiction in this court is proper as a court of a High Contracting Party. Defendants contend however that this particular court is not the correct internal forum for the plaintiffs' claims. Which court within a High Contracting Party should hear a case arising under the Convention is purely a matter of the High Contracting Party's internal law of venue and jurisdiction. *Mertens v. Flying Tiger Line, Inc.*, 341 F.2d 851 (2d. Cir.1965), *cert. denied*, 382 U.S. 816, 86 S.Ct. 38, 15 L.Ed.2d 64

(1965). The court must therefore examine the applicable law of jurisdiction and venue to determine whether it is the appropriate forum to hear the plaintiff's Warsaw cause of action. This brings the court to the provisions of Rule 4(e) of the Federal Rules of Civil Procedure.[34]

Rule 4(e) directs that process shall be served in "the circumstances and manner prescribed in the [local] statute or rule" if there is no provision for service within the federal statute creating a cause of action. FED.R.CIV.P. 4(e). The Warsaw Convention has not provided a method of service of process. Therefore, the internal law applicable to determine the proper exercise of jurisdiction in this case is the Kentucky long arm statute, K.R.S. § 454.210. *See Handley v. Indiana & Michigan Electric Co.*, 732 F.2d 1265, 1268–1270 (6th Cir. 1984); FED.R.CIV.P. 4(e). Defendants assert that under the relevant standards, they are not amenable to *in personam* jurisdiction under K.R.S. § 454.210.

### 2. Jurisdictional Standards

 When diversity of citizenship is the basis of a federal court's subject matter jurisdiction, the exercise of *in personam* jurisdiction is measured by the dictates of the due process clause of the fourteenth amendment. *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). However, when federal law is the basis of a federal court's subject matter jurisdiction, an assertion of *in personam* jurisdiction is measured by the strictures of the due process clause of the fifth amendment, not the fourteenth amendment.[35] *See Handley v. Indiana &*

---

**34.** FED.R.CIV.P. 4(e) provides:

Whenever a statute of the United States or an order of court thereunder provides for service of a summons, or of a notice, or of an order in lieu of summons upon a party not an inhabitant of or found within the state in which the district court is held, service may be made under the circumstances and in the manner prescribed by the statute or order, or, if there is no provision therein prescribing the manner of service, in a manner stated in this rule. Whenever a statute or rule of court of the state in which the district court is held provides (1) for service of a summons, or of a notice, or of an order in lieu of summons

upon a party not an inhabitant of or found within the state, or (2) for service upon or notice to him to appear and respond or defend in an action by reason of the attachment or garnishment or similar seizure of his property located within the state, service may in either case be made under the circumstances and in the manner prescribed in the statute or rule.

**35.** The court notes that other Circuits have ruled differently on the proper standard by which to measure the exercise of jurisdiction under the incorporative provisions of Rule 4(e). *See De-Melo v. Toche Marine, Inc.*, 711 F.2d 1260 (5th

*Michigan Elect. Co.*, 732 F.2d 1265, 1271 (6th Cir.1984).

■ What the differences are between the strictures of the two due process clauses is not entirely clear. In *Handley*, the court, construing the Kentucky long arm statute under the due process clause of the fifth amendment, stated that "[i]n the final analysis our task is to determine whether the district court's exercise of jurisdiction in this case offended 'traditional notions of fair play and substantial justice.' " *Handley, supra* at 1272. It is clear from the opinion in *Handley* that "minimum contacts" under the fifth amendment are only a measure of the defendant's amenability to suit in the forum. Accordingly, this court's task is to determine the relative burden and inconvenience to the defendant of litigating in this forum. *Handley, supra* at 1271.

The relative inconvenience of forcing a defendant to defend this suit in Kentucky is measured, at least in part, by the nature and quality of that defendant's connections with Kentucky. If, for instance, such contacts are substantial, continuous or constant then the defendant is not unfairly inconvenienced in litigating the case in this forum. Moreover, if the defendant's Kentucky contacts have been such that "he should reasonably anticipate being haled into court" here, *World-Wide Volkswagen,*

*supra* 100 S.Ct. at 567, then the inconvenience of forcing him to defend a suit in this forum is justified. Finally, if the maintenance of a defense would impose no actual undue burden upon the defendant, then the exercise of jurisdiction is appropriate.

■ In the present case, the court has already reviewed Defendant Arrow's economic and physical contacts with Kentucky. In so doing, the court found a substantial and continual series of purposeful acts by which Arrow availed itself of the benefits of Kentucky's laws. These contacts were such that Arrow should have anticipated being subject to the jurisdiction of a Kentucky court. As to the actual burden entailed in defending this action, there has been no showing that the maintenance of this case will be an overbearing burden on Arrow, a company which has been actively flying into Kentucky for an extended period of time. In light of the foregoing, the court finds that Arrow is neither unfairly burdened nor unduly inconvenienced by being forced to litigate the plaintiffs' claims against it in this court. Arrow is properly before this court on Plaintiffs' Warsaw claims.

## III. PENDENT PARTY JURISDICTION OVER BATCH AND WORLD

In addition to asserting federal question jurisdiction over Arrow, Plaintiffs seek to

---

Cir.1983); *Burstein v. State Bar of California,* 693 F.2d 511 (5th Cir.1982); *Carty v. Beech Aircraft Corp.,* 679 F.2d 1051 (3d Cir.1982); *De-James v. Magnificence Carriers, Inc.,* 654 F.2d 280 (3d Cir.1981), *cert. denied,* 454 U.S. 1085, 102 S.Ct. 642, 70 L.Ed.2d 620 (1981). *See* footnote 34 *supra* for the text of Rule 4(e). Recently, the Fifth Circuit Court of Appeals has held, *contra Handley,* that an assertion of jurisdiction via the incorporative provision of Rule 4(e) must be measured according to the strictures of the fourteenth amendment, and not the fifth amendment. *See Point Landing, Inc. v. Omni Capital International, Ltd,* 795 F.2d 415 (5th Cir.1986). This court cannot follow the ruling in *Point Landing* for the same reasons stated in Judge Wisdom's concurrence to that case.

This court can see no rational reason for imposing state legislative and territorial constraints on federal courts in federal question cases involving statutes that embody national policies. The absurdity of such restrictions in matters of national concern which require a uniform national policy is obvious. Applying

these restrictions so as to curtail the jurisdiction of this court to hear a case arising under a treaty of international scope, designed to provide international uniformity in certain matters, borders on the bizarre. Moreover, reading Rule 4(e) in the manner of the *Point Landing* court would contravene the spirit and letter of the Rules of Civil Procedure. Specifically, this court is bound by Rule 1 to construe the Rules of Procedure so as "to secure the just, speedy, and inexpensive determination of every action." FED.R.CIV.P. 1. Forcing plaintiffs to refile their federal actions in another court because of the jurisdictional restrictions applicable to the states would hardly accomplish this in any rational manner in the present case. Additionally, to read the provisions of Rule 4(e) in this manner would give substantive effect to that rule by limiting jurisdiction of the federal district courts. Such a reading would violate the proscription of Rule 82 which provides that "[t]hese rules shall not be construed to ... limit the jurisdiction of the United States district courts." FED.R.CIV.P. 82.

assert pendent jurisdiction over Batch and World. Plaintiffs contend that the claims against Arrow, Batch and World all arise out of "a common nucleus of operative fact" comprising one case, *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Plaintiffs claim that such circumstances give rise to the power in this court to decide matters bound up in the principal suit, and to hold other parties concerned with these matters, such as Batch and World, subject to the power of the court.

 Plaintiffs urge this court to exercise pendent party jurisdiction over Batch and World. Pendent party jurisdiction is recognized within the Sixth Circuit, *Koppers Co., Inc. v. Garling & Langlois*, 594 F.2d 1094, 1097 (6th Cir.1979) (recognizing the proper exercise of pendent party jurisdiction in affirming a dismissal of the claims on the merits); *Beautytuft, Inc. v. Factory Ins. Assoc.*, 431 F.2d 1122, 1128 (6th Cir.1970) (affirming the exercise of pendent party jurisdiction); *Patrum v. City of Greensburg*, 419 F.2d 1300 (6th Cir.1969) (recognizing the concept and limitations of exercising pendent party jurisdiction), but its exercise is not automatic. The exercise of pendent party jurisdiction is proper in a case in which 1) the pleadings disclose a substantial federal cause of action, 2) the relevant statutory language does not expressly or impliedly negate the existence of pendent party jurisdiction, and 3) the exercise of jurisdiction is appropriate.

### A. Substantial Federal Cause of Action

 The court must first consider whether the pleadings disclose a substantial federal claim, which gives rise to the power under Article III of the Constitution [36] to hear claims that "derive from a common nucleus of operative fact." *Gibbs, supra*, 86 S.Ct. at 1137–38. The court has already addressed the issue of the plaintiffs' claim under the Warsaw Convention, and found a substantial federal question. All the plaintiffs' state law claims against the defendants arise from the same accident which forms the basis for the plaintiffs' Warsaw cause of action. The fact that all claims derive from the single crash and the events leading up to it creates a commonality of proof, issues and parties amongst the several claims, making them all part of one constitutional "case" within the meaning of Article III, § 2 of the Constitution. *Gabel v. Hughes Air Corp.*, 350 F.Supp. 612 (C.D.Cal.1972).

### B. Relevant Statutory Language

 The court must attend "to the relevant statutory language" giving rise to this action to see whether "Congress in the statutes conferring jurisdiction has not expressly or by implication negated" the existence of pendent party jurisdiction. *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 2421–22, 49 L.Ed.2d 276 (1976). The court's examination of the Warsaw Convention is governed by the Convention's legislative history, by subsequent acts of the contracting parties and by pertinent legal opinions promulgated by courts with proper jurisdiction. *Block v. Compagnie Nationale Air France*, 386 F.2d 323, 337 (5th Cir.1967), *cert. denied*, 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968). All of these sources must be consulted, and the Convention liberally interpreted to effectuate its evident purposes. *Bacardi Corp. v. Domenech*, 311 U.S. 150, 61 S.Ct. 219, 225–26, 85 L.Ed. 98 (1940).

Taking all of these factors into account, the court observes that the Convention's purpose and history indicate an intention to provide uniform international limitations on *air carrier's* liability. *See Reed v. Wiser*, 555 F.2d 1079 (2d Cir.1977); *Benjamins v. British European Airways*, 572 F.2d 913 (2d Cir.1978); Preamble, Warsaw Convention.[37] In affecting this purpose, the Con-

---

**36.** Article III, § 2 of the Constitution provides in part that, "[t]he judicial Power shall extend to all Cases in Law and Equity, arising under this Constitution, [and] the laws of the United States."

**37.** The relevant part of the preamble provides that the High Contracting Parties "recognized the advantage of regulating in a uniform manner the conditions of international transportation by air in respect of the documents used for

vention creates a limited private cause of action against "carriers." [38] Who is encompassed within the term "carrier" [39] is the precise question before this court.

■ In *Reed v. Wiser, supra,* the Second Circuit Court of Appeals considered who fell within the limitations imposed by the Convention. Recognizing the purposes of the Convention, the limitations set forth in Articles 24 and 22(1),[40] and the subsequent expansion of protection afforded by the Hague Protocol,[41] the court held that the limitation on recovery from "carriers" necessarily implied limitations on recovery from a carrier's employees. *Reed, supra* at 1092. To hold otherwise, the Court reasoned, would undermine the Convention's purposes by allowing plaintiffs to circumvent the limitations in Article 22 by suing the carrier's employees. Similarly, the New York Supreme Court, Appellate Division, in *Julius Young Jewelry Manufacturing Co., Inc. v. Delta Air Lines and Aviation Service Company, Inc.,* 67

A.D.2d 148, 414 N.Y.S.2d 528 (1979), considering the same question, held that an independent contractor engaged by international carriers to handle baggage fell within the Convention's scope. In that case the court held that "[t]o allow an agent ... which is performing services in furtherance of the contract of carriage, and in place of the carriers themselves, to be liable without limit would circumvent the Convention's purposes of providing uniform worldwide liability rules and definite limits to the carriers' obligations." *Id.* Clearly, the framers of the Warsaw Convention intended to include all those concerned with the enterprise of air carriers' international air travel within the scope of the Convention. This broad scope certainly does not indicate the intent to negate the exercise of pendent party jurisdiction by a court hearing a Warsaw cause of action. Indeed, the terms and meaning of the Convention require the exercise of pendent party jurisdiction in some cases.

such transportation and of the liability of the carrier."

**38.** Warsaw Convention, Article 17.

**39.** This term is the English translation of the French "transporteur" in the official text. The court notes that the Warsaw Convention by its own terms encompasses and addresses the actions of "agents" of carriers. *See* Article 20 (carrier not liable if he proves that "he and his agents" took all necessary steps to avoid damage); Article 25 (carrier cannot have benefit of limitations if actions of "agent of carrier acting within the scope of his employment" are willful). However, the specific Article with which this court is concerned, Article 17, addresses only "carriers."

**40.** Article 24 provides:
(1) In the cases covered by articles 18 and 19, any action for damages, however founded, can only be brought subject to the conditions and limitations set out in this convention.
(2) In the cases covered by article 17 the provision of the preceding paragraph shall also apply, without prejudice to the questions as to who are the persons who have the right to bring suit and what are their respective rights.
Warsaw Convention, Article 24. Article 22(1) sets forth the substantive limitations referred to in Article 24. Article 22(1) provides:
In the transportation of passengers the liability of the carrier for each passenger shall be limited to the sum of 125,000 francs. ...

Nevertheless, by special contract, the carrier and the passenger may agree to a higher limit of liability.

**41.** The Hague Protocol is not part of the law of the United States. The United States participated in the conference which promulgated this modification to the Warsaw Convention, but has never adhered to the Protocol. As a manifestation of the parties understanding of the word "carrier" however, the Protocol is a proper subject of inspection for this court's inquiry. In this regard, Article 25A expands the limitations applied to "carriers" to include the agents or employees of carriers. Apparently, this Article was merely a clarifying provision, and did not alter the meaning of any other part of the Convention. Article 25A provides:
1. If an action is brought against a servant or agent of the carrier arising out of damage to which this Convention relates, such servant or agent, if he proves that he acted within the scope of his employment, shall be entitled to avail himself of the limits of liability which that carrier himself is entitled to invoke under Article 22.
2. The aggregate of the amounts recoverable from the carrier, his servants and agents, in that case, shall not exceed the said limits.
3. The provisions of paragraphs 1 and 2 of this article shall not apply if it is proved that the damage resulted from an act or omission of the servant or agent done with intent to cause damage or recklessly and with knowledge that damage would probably result.

The Convention does not exclude claims against carriers arising under other law. *See, e.g., In re Aircrash in Bali, Indonesia on April 22, 1974,* 684 F.2d 1301, 1311 n. 8 (9th Cir.1982); *Abramson v. Japan Airlines Co., Ltd.,* 739 F.2d 130 (3d Cir. 1984); *Schmidkunz v. Scandinavian Airlines System,* 628 F.2d 1205, 1207 (9th Cir. 1980); *Hill v. United Airlines,* 550 F.Supp. 1048, 1054 (D. Kansas 1982); *Husserl v. Swiss Air Transport Co.,* 351 F.Supp. 702 (S.D.N.Y.1972); Warsaw Convention, Article 24.[42] In other words, the Convention leaves open related but distinct state claims for recovery from carriers. This nonexclusive [43] scheme does not evidence any intent on the part of the framers to forbid or preclude the exercise of jurisdiction over state claims by a court hearing a Warsaw claim. *Cf. Jong-Yul v. Intern. Inst. of Metro. Detroit,* 510 F.Supp. 722 (E.D.Mich. 1981). Indeed, the Convention's nonexclusive scheme practically insures that courts will be routinely faced with both Warsaw and related state law claims in the same action.

In sum, the court finds nothing in the text or history of the Warsaw Convention that indicates that the exercise of pendent jurisdiction over Batch and World in the present case is prohibited. Moreover, because Batch and World were performing services in place of Arrow and in furtherance of Arrow's contract of carriage, the state law claims against Batch and World secondarily expose Arrow to potentially unlimited liability, contrary to the limitations imposed by the Warsaw Convention. To properly administer both the limitations and liabilities imposed by the Warsaw Convention, this court will exercise pendent jurisdiction over Batch and World and the state law claims brought against them in the present case.

## C. Propriety of the Exercise of Jurisdiction

As a final step in deciding whether to exercise pendent jurisdiction, the court must inquire if this is an appropriate case in which to exercise jurisdiction, taking into account considerations of judicial economy, convenience, and fairness to the litigants. *Gibbs, supra* at 1139. The court can envision no more convenient action than the present one.

In the present case, all claims arise out of the same accident. In resolving each of these claims, any court considering them must determine the actions of those who actually serviced Arrow's aircraft. Judicial economy dictates that, as much as possible, the myriad of issues and claims which have arisen out of the air crash of December 12, 1985 be resolved in one court rather than many. Further, in light of the sheer number of claims in this case, and the limited fund available to satisfy those claims if successful, the exercise of jurisdiction over pendent state claims would be in the greatest interest of justice to the parties. Accordingly, the exercise of pendent jurisdiction over Batch and World is appropriate in this case.

## IV. CONCLUSION

This court has *in personam* jurisdiction over Defendant Arrow Air pursuant to the Kentucky long arm statute, K.R.S. § 454.-210. Further, this court has jurisdiction over the claims against Arrow arising under Article 17 of the Warsaw Convention, as authorized by 28 U.S.C. § 1331(a). Fi-

---

**42.** The Convention was meant to provide common limitation on the laws of the High Contracting Parties, and not displace the law of each Party. This is seen in the wording of Article 24, recognizing "any action for damages, however founded" and by the aspects of litigation against carriers left to the internal law of each High Contracting Party. *See* Articles 21 (contributory negligence), 24(2) (standing of and allocation among survivors), Article 25 (fault equivalent to willful misconduct), 28 (procedure), and 29 (running of the period of limitations).

**43.** Where the Convention seeks to provide a uniform rule, it is quite specific. *See* Articles 28 (burden of proof), 20 and 25 (standards of negligence), 23 (contract liability limits), 27 (suits against the estate of tortfeasor), 22 and 25 (limitations on damage awards), 29 (period of limitations). As the supreme law of the land, these provisions pre-empt any aspects of other actions "however founded" to the extent that such actions are in conflict with the Convention. U.S. CONST., article VI, clause 2.

nally, this court shall exercise pendent jurisdiction over Defendants Batch and World in this case.